Alfred PEDRO, Respondent,

v.

Carl PEDRO, Jr., et al., Appellants.

No. C6–92–137.

Court of Appeals of Minnesota.

Aug. 11, 1992.

Review Denied Oct. 20, 1992.

Margaret M. Leighton, John Paul Martin, Petersen, Tews & Squires, Steven A. Clapp, Minneapolis, for respondent.

Roger A. Christianson, Christianson & Todd, Patricia J. Hartmann, St. Paul, for appellants.

Considered and decided by NORTON, P.J., and LANSING and DAVIES, JJ.

## OPINION

NORTON, Judge.

After a request for dissolution of The Pedro Companies by respondent, Alfred Pedro, appellants, Carl and Eugene Pedro and The Pedro Companies, moved that the action proceed as a buyout pursuant to Minn. Stat. § 302A.751 (1990).

After a jury awarded damages, this court determined the jury's verdict was merely advisory and remanded the case to the trial court to make findings. *Pedro v. Pedro*, 463 N.W.2d 285 (Minn.App.1990) (*Pedro 1*), *pet. for rev. denied* (Minn. Jan. 24, 1991). On remand, the trial court awarded damages for breach of fiduciary duty and for wrongful termination of lifetime employment. In addition to other issues, appellants challenge the propriety of the trial court's rulings on these matters.

## FACTS

Alfred, Carl, and Eugene Pedro are brothers who each owned a one-third interest in The Pedro Companies ("TPC"), a closely held Minnesota corporation, which manufactures and sells luggage and leather products. All three brothers worked in the business for all or most of their adult lives. TPC has annual sales of approximately $6 million. Carl has worked for TPC since 1940 and he is currently employed by the company. Eugene has worked for TPC since 1939 and is also currently employed by the company. Alfred worked for TPC for 45 years and was fired in 1987 at the age of 62. Each brother, as an equal shareholder, received the same benefit and compensation as the others. Each shareholder had an equal vote in the management of the company.

In 1968, all of the company's shareholders (the three brothers and their father) entered into a stock retirement agreement ("SRA") which was designated to facilitate the purchase of the shareholder's stock upon death, or when a living shareholder wished to sell his stock. In 1975, the father died and the company purchased his stock from his estate, pursuant to the terms of the SRA.

In 1979, the remaining shareholders (the three brothers) modified and re-executed the SRA, reducing the purchase price of the shares. The agreement provided in part:

> Until and unless changed the value of each share of stock shall be as follows: 75% of net book value at the end of the preceding calendar year. It is the intent of the parties that the value of a Stockholder's interest as herein determined does include good will.

The relationship between respondent and the other two shareholders deteriorated through 1987 and 1988, after Alfred discovered an apparent discrepancy of almost $330,000 between the internal accounting records and the TPC checking account. Approximately $40,000 was discovered in an emergency investigation, yet about $270,000 of the discrepancy remained unexplained.

Alfred was very concerned and insisted that an independent accountant be retained to locate the source of the discrepancy. In May 1987, Carl and Eugene agreed to retain an accountant to investigate the cash shortage. After a month with no results, TPC dismissed the accountant. Alfred testified that soon afterwards, the corporate accountant admitted in a meeting with all three brothers that there was a $140,000 to $147,000 discrepancy which was unexplainable.

Alfred testified that during this time, Eugene would interfere with his area of responsibility in the TPC plant and undermine his management authority. Alfred testified that he was told to cooperate, resign or be fired. He was told if he did not forget about the apparent discrepancy, his brothers would fire him. Alfred again repeated his demand that the corporation hire an independent accountant to investigate the situation.

In October 1987, a second independent accountant was hired to investigate the shortage. After concluding his investigation, the accountant issued a report identifying a $140,000 discrepancy which could not be reconciled. He testified that throughout his investigation, he was refused access to numerous documents. He also stated there were over 20 leads never followed up before he ended his investigation.

Alfred was placed on a mandatory leave of absence from TPC on October 27, 1987. In December 1987, Alfred received a written notice that he was fired and all of his pay and benefits were discontinued. Employees were informed that Alfred had a nervous breakdown.

Alfred commenced this action in February 1988. Upon remand from this court on the earlier appeal, the trial court made the following findings of fact and conclusions of law. The court awarded Alfred $766,582.33 as damages for his one-third ownership in TPC which was determined by the terms of the SRA. Alfred was awarded $58,260.69 for prejudgment interest on this award.

The trial court also awarded Alfred $563,417.67 based on its finding that the individual defendants had breached their fiduciary duties to Alfred. The award represented the difference between the fair market value of Alfred Pedro's stock as determined by the trial court and the value provided by the SRA. In addition, the trial court awarded $68,690.05 for prejudgment interest on this award.

The trial court further found that Alfred had a contract of lifetime employment with TPC. The court found wrongful termination and awarded him $256,740 as compensation for lost wages. Because the contract was for lifetime employment, the award represented lost wages until he reached the age of 72. The court reduced this award by payments made to Alfred since December 1989. Moreover, the court

awarded prejudgment interest in the sum of $31,750.37 on this award.

The trial court also awarded Alfred $200,000 for attorney fees and expenses incurred by him. This award was based on the trial court's finding that appellants had acted in a manner which was "arbitrary, vexatious and otherwise not in good faith * * * prior to and during this action." The court awarded Alfred an additional $6,063 for attorney fees for having to respond to appellants' motion to recuse the trial judge and for the preparation of Findings of Fact, Conclusions of Law and Order for Judgment.

### ISSUES

1. Was the evidence sufficient to support the trial court's finding of breach of fiduciary duty?

2. Did the trial court properly determine Alfred Pedro had a reasonable expectation of lifetime employment, thereby awarding him damages for lost wages following the buyout until he reached age 72?

3. Did the trial court make proper determinations regarding joint and several liability, prejudgment interest, recusal of the trial judge, and attorney fees?

### ANALYSIS

#### I.

■ Respondent claims appellants' challenge to the sufficiency of the finding of breach of fiduciary duty is improperly before this court. Respondent asserts appellants waived the issue by failing to challenge the jury's determination on this issue. We disagree. In *Pedro 1*, we remanded for independent findings by the trial court with the jury's verdict being merely advisory. It would be inequitable to hold that appellants are not bound by the jury verdict and then decide they have waived an issue by not challenging that nonbinding determination. Because this is appellants' first opportunity to challenge the sufficiency of the trial court findings as to breach of fiduciary duty, we must address that issue.

■ The trial court's findings of fact "shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." Minn. R.Civ.P. 52.01. When reviewing the trial court's findings this court is limited to deciding whether the findings are clearly erroneous. *Citizens State Bank of Hayfield v. Leth*, 450 N.W.2d 923, 925 (Minn.App. 1990). Clearly erroneous means "manifestly contrary to the weight of the evidence or not reasonably supported by the evidence as a whole." *Northern States Power Co. v. Lyon Food Prods., Inc.*, 304 Minn. 196, 201, 229 N.W.2d 521, 524 (1975) (citation omitted).

■ The relationship among shareholders in closely held corporations is analogous to that of partners. *See Westland Capitol Corp. v. Lucht Eng'g Inc.*, 308 N.W.2d 709, 712 (Minn.1981) (close corporation has been described as partnership in corporate guise). Shareholders in closely held corporations owe one another a fiduciary duty. *Evans v. Blesi*, 345 N.W.2d 775, 779 (Minn.App.1984). In a fiduciary relationship "the law imposes upon them highest standards of integrity and good faith in their dealings with each other." *Prince v. Sonnesyn*, 222 Minn. 528, 535, 25 N.W.2d 468, 472 (1946) (citation omitted). Owing a fiduciary duty includes dealing "openly, honestly and fairly with other shareholders." *Evans*, 345 N.W.2d at 779.

■ The court's findings of fact contain many examples where appellants did not act openly, honestly, and fairly with respondent Alfred Pedro. The trial court found that at no time since the action was commenced, did appellants ever implement payments admittedly due under the SRA. Appellants interfered with respondent's responsibilities in TPC and hired a private investigator to follow him when he was not in the office. The court found appellants fabricated accusations of neglect and malfeasance which were not substantiated during the trial.

Moreover, an employee testified that after respondent was terminated, employees were informed that he had a nervous

breakdown. Also, respondent testified he was told if he did not forget about the discrepancies in the financial records, his brothers would fire him. Finally, appellants admitted in their motion requesting a buyout, that they were acting "in a manner unfairly prejudicial" toward respondent pursuant to Minn.Stat. § 302A.751, subd. 1(b)(2) (1990). This admission supports a finding of breach of fiduciary duty.

Appellants claim no breach of fiduciary duty can exist because there has been no diminution in the value of the corporation or the stock value of respondent's shares. In support of this assertion, appellants cite several cases where actions by an officer or director did reduce the value of the corporation, constituting a breach of fiduciary duty. *See e.g., Jordan v. Duff and Phelps, Inc.*, 815 F.2d 429 (7th Cir.1987); *Coleman v. Taub*, 638 F.2d 628 (3rd Cir. 1981); *Harris v. Mardan Business Sys., Inc.*, 421 N.W.2d 350 (Minn.App.1988).

However, an action depleting a corporation's value is not the exclusive method of breaching one's fiduciary duties. *See Evans*, 345 N.W.2d at 779–80 (majority shareholders breached fiduciary duty to minority shareholder by forcing his resignation). Moreover, loss in value of a shareholder's stock is not the only measure of damages. *See Pavlidis v. New England Patriots Football Club, Inc.*, 675 F.Supp. 701, 703 (D.Mass.1987) (damages for corporate director's breach of fiduciary duty was either profits made by director or value of property at time of breach plus interest).[1]

■ Moreover, the measure of damages for the buyout was proper. In *Pedro 1*, this court stated:

> If the fair value of the shares is greater than the purchase price for the buyout as calculated from the formula in the SRA, the difference is the measure of respondent's damage resulting from having been forced to sell his shares in the company.

*Pedro*, 463 N.W.2d at 288. Here there was evidence in the record that the fair market value of respondent's shares equalled $1,330,000. After subtracting the undisputed purchase price set forth under the SRA of $766,582.33, the trial court properly awarded damages for breach of fiduciary duty of $563,417.67.

## II.

Appellants claim the evidence was insufficient for the court to find a contract for lifetime employment. They also assert damages for lost wages following the buyout were improper. Again, we are unable to set aside findings of fact unless they are clearly erroneous. Minn.R.Civ.P. 52.01. Based upon the unique facts in this case, we affirm the trial court's award of damages for lost wages.

■ Trial courts have broad equitable powers in fashioning relief for the buyout of shareholders in a closely held corporation. Minn.Stat. § 302A.751, subd. 3a provides:

> In determining whether to order equitable relief, dissolution, or a buy-out, the court shall take into consideration the duty which all shareholders in a closely held corporation owe one another to act in an honest, fair and reasonable manner in the operation of the corporation and the reasonable expectations of the shareholders as they exist at the inception and develop during the course of the shareholders' relationship with the corporation and with each other.

This section allows courts to look to respondent's reasonable expectations when awarding damages. In addition to an ownership interest,

> [t]he reasonable expectations of such a shareholder are a job, salary, a significant place in management, and economic security for his family.

Joseph E. Olson, *A Statutory Elixir for the Oppression Malady*, 36 Mercer L.Rev. 627, 629 (1985) (footnote omitted).

---

1. This court recognized in *Pedro 1* that damages were appropriate even where there was no diminution of respondent's stock value by stating: "Inasmuch as appellants' breaches of fiduciary duty forced the buyout, they cannot benefit from wrongful treatment of their fellow shareholder and must disgorge any such gain." *Pedro*, 463 N.W.2d at 288.

In *Pine River State Bank v. Mettille*, 333 N.W.2d 622 (Minn.1983), the supreme court explained that the court must ascertain the intent of the parties to the employment contract. *Id.* at 628. When ascertaining the intent, trial courts must consider the written and oral negotiations of the parties as well as the parties' situation, the type of employment and the particular circumstances of the case. *Eklund v. Vincent Brass and Aluminum Co.*, 351 N.W.2d 371, 376 (Minn.App.1984), *pet. for rev. denied* (Minn. Nov. 1, 1984).

> In a closely held corporation the nature of the employment of a shareholder may create a reasonable expectation by the employee-owner that his employment is not terminable at will.

*Pedro*, 463 N.W.2d at 289.

The unique facts in the record support the trial court's finding of an agreement to provide lifetime employment to respondent. Carl Pedro, Sr. worked at the corporation until his death. Eugene Pedro, who worked for over 50 years at TPC, testified that he intended to always work for the company. Carl Pedro, Jr. worked at TPC for over 34 years. Alfred Pedro testified of his expectation of a lifetime job like his father. He had already been employed by TPC for 45 years. Even the corporate accountant testified regarding Carl's and Eugene's expectations that they would work for the corporation as long as they wanted. Based upon this evidence it was reasonable for the trial court to determine that the parties did in fact have a contract that was not terminable at will.

■ Appellants claim a grant of damages for both lost wages and breach of fiduciary duty under § 302A.751, subd. 3a allows respondent a double recovery. In support of this assertion, appellants misquote *Pedro 1* in their brief by connecting, within one block quotation, sentences from entirely different sections of the opinion. In any event, section 302A.751, subd. 3a allows the trial court to consider respondent's reasonable expectations. Even appellants concede respondent has two separate interests, as owner and employee. Thus, allowing recovery for each interest is

appropriate and will not be considered a double recovery.

Finally, appellants dispute the trial court's award of damages for lost wages following the buyout. They claim once respondent's ownership interest is severed, he has no right to damages for lost wages. We believe the trial court's award of future damages for lost wages is wholly consistent with the court's broad equitable powers found in § 302A.751, subd. 3a and is warranted based upon its finding of a contract for lifetime employment.

### III.

Appellants further challenge the trial court's determinations regarding joint and several liability, prejudgment interest, recusal of the trial judge and attorney fees. We address each challenge in turn.

■ A. Appellants have waived the opportunity to challenge the joint and several liability issue. After the original jury verdict, appellants made this same argument in their motion for JNOV or a new trial. This motion was denied by the trial court and appellants failed to raise the issue of personal liability for the individual appellants in the first appeal. Joint and several liability is now law of the case.

■ In any event, Minn.Stat. § 302A.751 allows a trial court to grant any equitable relief it deems just and reasonable under the circumstances. Appellants cite no authority that prohibits a trial court's ability to order joint and severally liability.

B. Appellants claim the trial court's award of prejudgment interest was improper. Interest on verdicts, awards and judgments is allowed:

> [w]hen the judgment is for the recovery of money * * * interest from the time of the verdict or report until judgment is finally entered shall be computed by the court administrator as provided in clause (c) and added to the judgment.

Minn.Stat. § 549.09, subd. 1(a) (1990). Preverdict interest will not be allowed for future or punitive damages. Minn.Stat. § 549.09, subd. 1(b)(3), (4). Here the jury

rendered its verdict on December 11, 1989 and the trial court awarded interest from that date forward. Because the interest only began accruing after the jury's verdict, the exclusion for interest on future or punitive damages is inapplicable.

C. Appellants made a motion to recuse the trial judge from making the factual findings upon remand arguing that the post-trial discussion between the judge and respondent tainted the court's findings on remand. It is within the trial court's discretion whether or not to honor a request for removal of a judge based on allegations of actual prejudice. *Durell v. Mayo Found.*, 429 N.W.2d 704, 705 (Minn. App.1988), *pet. for rev. denied* (Minn. Nov. 16, 1988). In order for bias or prejudice to be disqualifying it "must stem from an extrajudicial source and result in an opinion on the merits on some ·basis other than what the judge learned from his participation in the case." *In re Estate of Lange*, 398 N.W.2d 569, 573 (Minn.App. 1986). The contacts between the trial judge and respondent Alfred Pedro all took place after the jury rendered its verdict. There was no way the judge could have known the case would be' remanded to him for making findings. In any event, the judge's findings were supported by evidence from the record. Moreover, remanding the case for new findings would not comport with judicial economy.

D. Finally, appellants challenge the trial court's award of attorney fees. Under section 302A.751, subd. 4, if the court finds a party to a proceeding brought under this section has acted arbitrarily, vexatiously or otherwise not in good faith, it may, in its discretion, award reasonable expenses, including attorneys fees and disbursements to any of the other parties. Here, the trial court made specific findings that appellants both breached fiduciary duties and acted arbitrarily, vexatiously or otherwise not in good faith. Once this has been done, the trial court has discretion to award attorney fees. *See Becker v. Alloy Hardfacing & Eng'g Co.*, 401 N.W.2d 655, 661 (Minn.1987) (appellate court will not reverse trial court's award or denial of attorney fees absent abuse of discretion).

## DECISION

The facts of this case support the trial court's findings that appellants breached their fiduciary duties to respondent and wrongfully terminated his contract for lifetime employment.

Affirmed.